UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 15cr2586-GPC |
|---|---|
| Plaintiff, | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS INDICTMENT UNDER THE COURT'S SUPERVISORY POWERS** |
| v. | |
| JARIS JESUS TORRES-ITURRE (1); JOSE UBER ESTUPINAN-CARABALI (2); ASCENCION ROJAS-BOLANOS (3), | [Dkt. No. 37.] |
| Defendants. | |

On January 11, 2016, Defendant Ascencion Rojas-Bolanos ("Defendant" or "Rojas") filed a motion to dismiss the indictment under the Court's supervisory powers. (Dkt. No. 37.) On January 12, 2016, Defendant Jaris Jesus Torres-Iturre ("Torres") filed a motion for joinder. (Dkt. No. 38.) At a hearing held on January 22, 2016, Defendant Jose Uber Estupinan-Carabali ("Estupinan") moved orally to join in the motion which has since been withdrawn following his guilty plea on April 21, 2016. (Dkt. No. 80.)

The government filed an opposition. (Dkt. No. 42.) Defendant filed a reply on January 21, 2016, and the government filed a sur-reply on January 22, 2016. (Dkt. Nos. 46, 47.) An evidentiary hearing was held on April 21, 2016. (Dkt. No. 78.) Patrick Bumatay, Esq. and Emily P. Reuter, Esq. appeared on behalf of the government. (Id.) Ellis Johnston, Esq. appeared on behalf of Defendant Estupinan, Robert Garcia,

Esq. appeared on behalf of Defendant Torres, and John Lemon, Esq. appeared on behalf of Defendant Rojas. (Id.) Following the hearing, the Court took the matter under submission. Based upon the pleadings, evidence submitted and arguments of counsel, the motion to dismiss based upon the Court's supervisory powers is DENIED.

## BACKGROUND

On September 5, 2015, a military patrol aircraft ("MPA") spotted a suspected go-fast vessel[1] ("vessel") traveling in a northerly direction about 128 nautical miles southwest of the Costa Rica/Panama border, in international waters in the Eastern Pacific Ocean. The MPA continued to observe the vessel which was observed jettisoning objects overboard. During this observation, the United States Coast Guard ("USCG") Cutter BERTHOLF was notified and diverted to intercept the vessel. The BERTHOLF launched its helicopter and two small boat teams. One small boat team returned to the BERTHOLF after having experienced a breakdown.

The MPA directed the helicopter to the vessel. The helicopter hailed the vessel, which failed to stop. The helicopter was authorized to utilize and employed three stitches of warning shots. After determining that the warning shots were ineffective, the helicopter employed five precision shots to the engine which caused the vessel to stop. Once stopped, a USCG team from the BERTHOLF arrived on-scene in a small boat and observed the three Defendants aboard the vessel. Defendant Torres claimed to be the master of the vessel and made a verbal claim of Ecuadorian nationality for the vessel. Defendants claimed Colombian nationality for themselves. Torres stated that he and the crew had initially been contracted as fisherman and were later forced at gunpoint to transport the contraband.

The USCG team searched the vessel and found no contraband. The small boat team recovered thirteen (13) bales of suspected contraband from the debris fields where Defendants were seen jettisoning the packages. The 13 recovered bales contained

---

[1]Go-fast vessels are boats that travel at high rates of speed and are preferred vehicles for drug and alien smuggling operations. *United States v. Perlaza*, 439 F.3d 1149, 1153 n.2 (9th Cir. 2006).

bricks that consisted of about 711 kilograms of a white powdery substance that field-tested positive for cocaine.

On September 5, 2015, pursuant to an agreement between the United States and Ecuador, the United States requested that the government of Ecuador confirm the vessel's registry, and if confirmed, grant authorization to stop, board and search the vessel. On the same day, the government of Ecuador responded that it could neither confirm nor refute the vessel's registry. The government determined the vessel to be without nationality or stateless pursuant to 46 U.S.C. § 70502(d)(1)(C)[2] and subject to United States jurisdiction pursuant to 46 U.S.C. § 70502(c)(1)(A).[3]

On September 8, 2015, the case was assigned to the Southern District of California for prosecution and Special Agent Justin Faw ("Special Agent Faw") of the Drug Enforcement Administration ("DEA") was assigned the responsibility of coordinating the transportation of the crewmembers to the United States for prosecution. Special Agent Faw understood that Defendants needed to be transported to the Southern District of California as quickly as reasonably possible and began to coordinate their transportation with the USCG and DEA.

Special Agent Faw contacted the DEA air wing for a DEA aircraft and learned that the DEA aircraft capable of transporting Defendants to San Diego was in maintenance and would be unavailable until on or around September 15, 2015. Due to safety concerns and flight schedules, he concluded that commercial airlines transport was not an option. Special Agent Faw also contacted the USCG and learned that (1) no USCG maritime vessel was available to transport Defendants to San Diego within a reasonable timeframe and (2) that a USCG C130 aircraft might be able to transport Defendants on September 28, 2015. Special Agent Faw also contacted the United

---

[2] The term "'vessel without nationality' includes . . . (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C).

[3] The term "'vessel subject to the jurisdiction of the United States' includes-- (A) a vessel without nationality. . . ." 46 U.S.C. § 70502(c)(1)(A).

States Marshals Service and learned that the earliest transport of Defendants from Panama or Guatemala would take 90-180 days to coordinate. On September 17, 2015, Special Agent Faw was advised that the USCG CUTTER ACTIVE would be available to transport the Defendants to San Diego with an expected arrival date of September 25th or 26th. Given the means of transportation available, Special Agent Faw arranged for Defendants to be transported to San Diego on the ACTIVE.

Defendants arrived in San Diego, California on September 26, 2015. On October 6, 2016, Defendants were indicted on two counts for conspiracy to distribute cocaine on board a vessel in violation of 46 U.S.C. §§ 70503, 70506(b), and conspiracy to distribute cocaine intended for unlawful importation in violation of 21 U.S.C. §§ 959, 960, and 963.

On October 8, 2015, Defendants pleaded not guilty to the two count indictment. On January 11, 2016, Defendant Rojas filed a motion to dismiss indictment based upon the Court's supervisory powers. On January 22, 2016, the Court granted Torres' motion for joinder in Rojas' motion.

## DISCUSSION

Defendants move to dismiss the indictment under the Court's supervisory power arguing that the government's willful failure to comply with Federal Rule of Civil Procedure ("Rule") 5's presentment requirement, combined with the deplorable conditions of confinement for the defendants, is a straightforward due-process violation warranting dismissal. The government responds that it took reasonable steps to transport Defendants to San Diego, that any delay was not unreasonable, conditions of confinement were adequate and dismissal of the indictment is an unavailable remedy for the violation of Rule 5.

**A.    Delay in Presentment Under Rule 5**

The federal rules require that an arresting officer bring a defendant to court for his initial appearance before a magistrate judge "without unnecessary delay." Fed. R. Crim. P. 5(a)(1)(A). The Supreme Court has held in a number of cases that the remedy

for a Rule 5 violation is the suppression of evidence obtained as a result of a violation, not dismissal of the indictment. *See, e.g., Corley v. United States*, 556 U.S. 303, 323 (2009). The Ninth Circuit has upheld denials of motions to dismiss an indictment for presentment violations, finding dismissal an unavailable remedy. *Bayless v. United States*, 381 F.2d 67, 70-71 (9th Cir. 1967) (rejecting dismissal as an appropriate remedy despite a four-month delay in presentment); *United States v. Studley*, 783 F.2d 934, 937 n. 2 (9th Cir. 1986) ("[T]he normal remedy for violation of Rule 5(a) is suppression of evidence obtained during the unreasonable delay[.]").

Meanwhile, district courts in maritime drug cases have also recognized that a violation of Rule 5 does not justify dismissal of an indictment. *See United States v. Savchenko*, 201 F.R.D. 503, 509 (S.D. Cal. 2001) (Rule 5 "is not a general remedial statute, but rather a rule designed to deal with a particular problem by applying an evidentiary sanction."); *United States v. Gonzalez-Corredor*, Case No. 12-cr-2550-DMS, Dkt. Nos. 54, 67 at 151 (S.D. Cal. Dec. 13, 2012) (a 19-day delay found not unreasonable, recognizing the "monumental undertaking" involved in coordinating the "safe yet efficient" transportation of defendants apprehended in international waters near Panama). In *Savchenko*, the court noted, "[w]hereas 16 days might be deemed unreasonable for the delay in a first appearance concerning an arrest at the International Border with Mexico, some 16 miles south of the courthouse, the 16 days is more than reasonable for the transport of the fishing vessel from the high seas approximately 500 nautical miles from Mexico to this district under these facts and circumstances." 201 F.R.D. at 506. As stated in *Savchenko*, "even if the delay in transport of the defendants from the high seas to the district court were found unnecessary or unreasonable, those facts alone would not justify dismissal since that is not a sanction available under Rule 5." *Id.* at 509.

*United States v. Osunde*, 638 F. Supp. 171, 176-77 (N.D. Cal. 1986), is the only case where a district court has dismissed an indictment with prejudice as a remedy for violation of Rule 5. However, in *Osunde*, defendant was arrested at the Los Angeles

International Airport and was kept in custody for 106 days before a complaint was filed. The court found that the passage of 106 days between the defendant's arrest and his first appearance before the magistrate judge was, without a doubt, a grossly unnecessary delay and warranted dismissal of the charges. The *Osunde* Court acknowledged the extreme and unprecedented nature of its actions. *Id*. ("Although never imposed in this circuit, the remedial sanction of dismissal has been contemplated for flagrant unnecessary delays in bringing an arrested person before a magistrate. The 106–day delay which occurred in the matter at bar would appear to present the appropriate facts warranting dismissal.") (citation omitted).

Unlike *Osunde,* the delay in the instant case was 21 days and not 106 days. Moreover, Osunde was arrested and detained within the district where he was charged. Here, Defendants were arrested 2439 nautical miles from San Diego, California where there were few options to transport them to San Diego, the place of prosecution. In addition, there was no unreasonable delay in the probable cause determination following the Defendants' arrival in San Diego. Defendants arrived in San Diego on Saturday, September 26, 2015, when a complaint was sent to Magistrate Judge Barbara Major via email and then signed on Monday, September 28, 2015.

**B.     Delay in Presentment - Court's Supervisory Powers to Remedy Delay**

In addition, Defendants argue that the Court should dismiss the indictment as an exercise of its supervisory powers because dismissal would remedy both the delay in this case and possible delays in the future. Defendants argue that the Rule 5 violation was willful as demonstrated by logbooks produced in discovery which reflect that the detainees were swapped back and forth between two Coast Guard cutters, BERTHOLF and ACTIVE, three times before finally being brought to court. Defendants assert that this occurred during a four-month window in which Coast Guard vessels (including BERTHOLF and ACTIVE) made 24 seizures, totaling 25 tons of cocaine and, thus, it is reasonable to infer that the Coast Guard prioritizes narcotics enforcement over compliance with the Federal Rules of Criminal Procedure.

The Ninth Circuit has articulated three legitimate bases for dismissing prosecutions: "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995), opinion amended on other grounds on denial of reh'g, 98 F.3d 1100 (9th Cir. 1996) (citations omitted). To obtain dismissal for some government misconduct, including pre-indictment delay, there must be a showing of "outrageous conduct" which violates the defendant's due process rights under the Fifth Amendment, or a violation of some other substantive right such as the Speedy Trial Act. *See United States v. DiGregorio*, 795 F.Supp. 630, 634 (S.D.N.Y. 1992) (citing *United States v. Russell*, 411 U.S. 423 (1973)). A district court may dismiss an indictment under its supervisory powers "only when the defendant suffers substantial prejudice, and where no lesser remedial action is available." *United States v. Minero-Rojas,* No. 11CR3253 BTM, 2011 WL 5925220, at *9 (S.D. Cal. Nov. 3, 2011) (*citing United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008)).

In this case, Defendants' vessel was found approximately 2439 nautical miles from San Diego, California. (Complaint, Dkt. No. 1.) The drug seizure was made by the USCG and the prosecution was then assigned to the DEA. DEA Special Agent Faw exhausted a number of options before deciding on the ACTIVE to transport Defendants to San Diego. Given the limited alternatives, 21 days to transport Defendants to San Diego was a reasonable period of time and does not support a claim of "outrageous conduct".

Moreover, while Defendants argue that dismissal would help deter future delay, they have failed to demonstrate that their case was prejudiced in any way by the delay. Because there has been no showing of substantial prejudice as a product of the delay, dismissal is improper under the Court's supervisory powers.

///

### C.    Conditions of Confinement - Outrageous Government Conduct

Defendants assert that the manner in which they were confined aboard the USCG cutters warrants dismissal. (Rojas Mot. at 5-6, Dkt. No. 37-1.) The government has addressed this argument as a due process claim of outrageous )governmental conduct.

"[T]he manner by which a defendant is brought to trial does not affect the government's ability to try him." *Matta-Ballesteros*, 71 F.3d at 762 (citing *Ker v. Illinois*, 119 U.S. 436, 444 (1886), and *Frisbie v. Collins*, 342 U.S. 519, 522 (1952)). An exception to this general principle exists when the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983). Defendant bears the burden of proving that the government's conduct was "so excessive, flagrant, scandalous, intolerable, and offensive as to violate due process." *United States v. Edmonds*, 103 F.3d 822, 825 (9th Cir. 1996) (quoting *United States v. Garza–Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)); *United States v. Lazarevich*, 147 F.3d 1061, 1065 (9th Cir. 1998) (finding the evidence in equipoise, the district judge was required to rule against the defendant). No Ninth Circuit opinion has approved dismissal of an indictment based on claim of outrageous conduct regarding conditions of confinement. No federal appellate court nationwide has dismissed an MDLEA case based on treatment of defendants aboard U.S. Coast Guard or U.S. Navy ships.

To succeed on a motion to dismiss, Defendants must make "a strong showing of grossly cruel and unusual barbarities inflicted upon him by persons who can be characterized as paid agents of the United States." *Matta-Ballesteros*, 71 F.3d at 764. In *Matta-Ballesteros*, the defendant alleged that, while being transported bound and hooded to a U.S. Air Force Base, he was beaten and burned with a stun gun at the direction of the Marshals. *Id.* at 761. The Ninth Circuit held that, even taking those "disturbing" circumstances as true, the defendant failed to meet the "rigorous standard" of demonstrating governmental misconduct "of the most shocking and outrageous kind." *Id.* at 764. Accordingly, it held that, "much as we may want to dismiss this case

through an exercise of our supervisory powers, to do so would be unwarranted." *Id.* at 764-65.

As evidence of grossly cruel and unusual barbarities, Defendants rely on the detainee logbook which reveals that: 1) the detainees were permitted showers only every third or fourth day; 2) while on the ACTIVE, rice and beans were served for virtually every meal; 3) the detainees complained about the rice and beans and refused to eat breakfast on at least one occasion because the previous night's rice and beans had made them sick; 4) one of the detainees complained that his plastic jumpsuit had given him a rash. (Dkt. No. 37-2.) In addition, Rojas stated: 1) plastic jumpsuits were provided and were very uncomfortable and they were not provided with undergarments; 2) they were shackled by one leg to the deck of the vessel at all times (they were not given chairs); 3) they slept on a concrete deck (resembling an aircraft hangar), provided with only thin plastic mats and a blanket; 4) when permitted to shower, they did so with a hose and with no privacy; 5) their "head" was an aluminum container resembling a bedpan (also with no privacy); and 6) they had to dispose of feces and urine by spraying it overboard with a hose. As to Defendants' time on the ACTIVE, Rojas states: 1) they were permitted to "shower" only every fourth day; 2) on one occasion they had to dispose of feces with their hands (using gloves) rather than the hose; and 3) while their concrete deck still resembled an aircraft hangar, it was open at one end (lacking the garage-style door of the other vessel), which exposed them to extreme cold; and 4) the deck was also close to the engines, which would cover them in soot from the exhaust within a few hours after showering.

The Government also points to the same detainee logbook to demonstrate Defendants were fed three times a day, including meals such as steak, pizza, chocolate chip pancakes, and hamburgers; were provided ample water and opportunities for the restroom and showers; were provided jumpsuits or Tyvek suits; were provided hygienic items; received medical attention; and were housed with their fellow co-defendants. (Dkt. No. 37-2.) Government's Exhibit 5 depicts the conditions of Defendants' stay

on board the BERTHOLF, which show mats to sleep on, blankets, toiletries, and clothing. (Dkt. No. 42-5.) Government's Exhibit 6 demonstrates the toilet used by Defendants on the BERTHOLF, which shows that it functionally flushes into the ocean. (Dkt. No. 42-6) Government's Exhibit 7 shows the similar conditions aboard the ACTIVE. (Dkt. No. 42-7.) Government's Exhibit 8 depicts the privacy afforded the use of the toilet and shower area onboard the ACTIVE. (Dkt. No. 42-8.)

Assuming the allegations of Defendants Rojas and Torres are true, the four-day period of length of time between some showers, having to clean a toilet on one occasion with their gloved hands, exposures to the elements through a garage style door, spoiled rice and beans on one occasion, and exposure to soot from the engines cannot be considered "so grossly shocking and so outrageous as to violate the universal sense of justice." *See United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995).

## CONCLUSION

Based on the above, the Court DENIES Defendants' motion to dismiss the indictment based on the Court's supervisory power.

IT IS SO ORDERED.

DATED: May 12, 2016

HON. GONZALO P. CURIEL
United States District Judge